The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. All right. Good morning. Mr. Bacharach, are you ready? Yes, Your Honor. You may proceed. Thank you, Your Honor. May it please the Court, my name is Al Bacharach. I represent the appellant, Bryce Johnston. In order to resolve the underlying litigation in the Lumber Liquidator matter, class counsel and the defendant entered into a settlement agreement. The settlement agreement provides for an attorney's fee maximum of one-third of the value of the settlement. Class counsel could have contracted for some certain, such as $11,000, but they did not. They went with the percentage. In the previous appeal, this court found that the settlement agreement was fair, adequate, and reasonable. The court also found that despite the wording of the settlement agreement, that the store vouchers provided by the settlement were coupons under the Class Action Fairness Act. Because the store vouchers were coupons, they could not be used as a number that the District Court could then take a percentage of in setting an attorney's fee. So the settlement, which includes $22 million in cash and $14 million in coupons, turned out to be worth $22 million because under the Class Action Fairness Act, the coupons have no value until they're redeemed. The reason for that is because a percentage of the coupons will probably not be redeemed. And in fact, a high redemption rate in this matter would be 10%, which would mean that the $14 million turned into $1.4 million. So you can't do a percentage based on the coupon's face value. You have to wait for there to be a redemption. When this court entered the original order, it also approved the settlement contract per se as fair, adequate, and reasonable. The only point to the remand was to recalculate the proper amount of attorney's fees. In calculating the attorney's fees after remand, the District Court noted that there was a problem because the settlement agreement itself and the notice to the class both limit the attorney's fees to a one-third percentage of the value of the settlement. That one-third had dropped from one-third of $36 million, the two parts of coupons plus cash, to the one-third of the cash value, which turned out to be about seven. Can I ask you, it strikes me that your entire argument is based on an apples and oranges comparison, and that the District Court has to do two things. It has to decide if the fee award is reasonable under CAFA, and it has to decide whether it complies with the contract. And those are separate questions. I agree that in deciding whether it's reasonable under CAFA, this court's opinions previously said that if you're going to calculate it based on a percentage, you have to ignore the coupons or the redeemed value. But that doesn't determine what the purpose is for purposes of the contract, and here the contract specifically defines the coupon value as part of the value for purposes of the 33% cap. So I guess I just want to give you a chance to address my conception. I think your entire argument is confusing two different questions, whether it's reasonable under CAFA and whether it complies with the contract. Respectfully, I don't believe I'm confusing the two. The issue under CAFA would be an issue of first impression in this circuit with regard to subsection B, the court's ability to award fees based on a load start. But awarding fees based on a load start doesn't get you past the contractual limitation of the settlement agreement. The contract says it's to be interpreted pursuant to the laws of the state of Virginia. In Virginia, the Supreme Court recognizes that settlement agreements are contracts and that the terms of the contract control what the parties bargain for. In this matter, the parties bargain for an attorney's fee of one-third of the value. So the current value is $22 million. But then what do you do about the fact that the contract defines the value as 22 plus 14? The contract tells us what the denominator is. The contract says for purposes of the contract, the denominator is 36. Well, Your Honor, the contract provides for severability. It specifically says that the terms of the contract, if any one of them is found to be invalid, that the contract is interpreted around the invalid term. So for the district court to be correct in awarding a fee of 45.8% in this matter, this court would have to find that the severability subsection of the contract is invalid. That's not correct under Virginia law. So we would look at the contract. We would sever that portion of the contract that says that the coupons are worth $14 million. You don't have to do anything besides sever that out. That leaves you with an agreement that the attorney's fees will max out at one-third of the value of the settlement, which is the $22 million figure. It is the amount that the class was noticed in terms of due process would be the maximum attorney's fee in this matter. So it can't not limit the attorney's fees simply because class counsel made a mistake with regard to how they wrote up the contract. The contract should be interpreted against the person who is drafting it, not against the class members who are paying $4 million. May I finish the answer? Yes, you may. Not against the class members who end up paying an additional $4 million in fees to class counsel. Thank you. Mr. Klor? Good morning. This is the second time we are before the court on this $10 million fee. The first time the court vacated based on the district court's failure to apply CAFA. This time the district court misapplied CAFA by indulging the full $14 million face value of the coupons while ignoring the redemption rates. This court, in its prior opinion, recognized a circuit split between the Seventh and the Ninth Circuit regarding whether the Lodestar method is allowed at all for awarding fees from coupons. But what there is not a circuit split on is the discrete issue that Cantu Guerrero has focused on. And that is, when you are engaging in the Lodestar analysis and you are awarding fees and you are including coupons, can you consider the coupons without looking at the redemption rates and while assuming full face value? So every court of appeals that has addressed that specific issue has held that you cannot do that under CAFA because it defeats the purpose, one of the underlying objectives of CAFA, which is to discourage attorneys from puffing settlement value with coupons so they can take a lion's share of the cash, which is exactly what happened in this case. And class counsel argue that the court wasn't attributing value, but if you look at page five, jump page five of the Westlaw site, it clearly did. It did place value on the coupons and it compared and contrasted the cash awards, which provide a relatively small percentage of reimbursement with the voucher awards, which the court said, quote, subsidize a significant portion of the replacement costs. And then additionally, in the background section and elsewhere, the court referenced the vouchers at their full base value and never looked behind to see the redemption rates. I think the Sixth Circuit opinion in MN versus Vitamix, which is a 2020 opinion, is most instructive. Wait, counsel, you've mentioned a couple of things that the district court says, but you left out a rather significant thing the district court said, and I'd like to get your response. I mean, the court said it was awarding fees. This is that supplemental appendix 1109. The district court says, quote, without attributing any value, face value or redemption value to the coupon portion of the settlement. That is an express statement by the district court. What do you do with that? The problem with that is that's at the front of the opinion. And then the actual analysis where the court considers what the settlement is worth. So the Lozar analysis is you look at the hours, you look at the rates, and then you can adjust it based on the degree of success, which is the third step. And that third step, the court repeatedly discusses the value of the vouchers as if it's just $14 million and says, look, the cash, recognizing the cash is going to only reimburse class members for 5%, but the vouchers are much more significant reimbursement. And so you can say that. I mean, that's all that is, is words at the outset. But the analysis demonstrates that the court did actually consider their value and did not look behind their face value to consider the redemption rates. And that's The court is looking at a degree of success. Are you saying that the vouchers don't factor in that calculus? I'm saying For the purposes of determining degree of success, forget about value in that sense. Are you saying that the court can't consider the vouchers as to the degree of success? Oh, no, Your Honor. The court can consider the vouchers and the degree of success, but it can't consider the face value without looking behind and seeing what are the redemption rates. And that's But no, what it did, the first steps of the load start determine, you know, how much time was spent and that was found to be reasonable. Then at what rate was the time bill that was reasonable. The second step, what would be minus. Well, I already got some confusion here. They said it was all completely successful. So The minus figure could have been zero, but forget about that. Whatever it is now having found the work spent Was proper time and the rate at which it was charged as proper. Now let's see what the success is and give it no value to the coupons at the earlier part. But you say, but that is successful, no matter whether, for example, if I give you a check for $10,000 And but you never cash it. It's still success when the lawyer said, oh, I'm going to get my fee because my client decides not to cash my $10,000 check. Well, how do you dismiss that from the degree of success to coupons? I don't, I'm not asking for the court to dismiss it from the degree of success, but in your example, we're not talking about a $10,000 check. We're talking about coupons that have Some value, but they presented no evidence of what that value is. And that's But all these people who decided they wanted to coupons and those who didn't want it. That was the cash part. Am I correct You are correct that those 20,000 or so folks who selected Didn't want Don't you think that has an influence of what the normal redemption rate is, which is something your colleague said 10% or so here where they elected having had an opportunity to get the cash. They said, no, we want coupon. Wouldn't that change the calculus, even that? So these are all good questions and they could have been They should have been answered by class counsel 28 USC 1712 D provided them an opportunity to present expert testimony on what the likelihood of redemption rates are. There's an in this case of believe there'll be even 10% most rates are actually closer to 5% or based on studies that we cited So can I ask you one question in your remaining time. Do I understand you to have said earlier that you are not urging us to adopt the Ninth Circuit's outlier view that the district court could not apply the load star in this case. So we didn't take a position on that because, you know, there's a district court went with the seven circuits position that you can and, you know, our, our position. Our point is that regardless of what method you use. If you're going to their vouchers. You don't get to pretend they're worth the face value that everyone knows they're not Thank you. All right. Did you want to conclude that we did pepper you quite a bit. I know you started your time and something else you want to take a minute to wrap up just want to be Sure, sure. So Well, I wanted to get more into the Lenin case. I'm happy to answer questions about that opinion. But otherwise, I just point out that what we're requesting from the court is what granted a little bit unusual asking for the court to to enter a fee rather than remand again. And the reason we're doing so is number one, judicial economy and number two. This would be a third bite at the apple class council had the opportunity. We urge them below repeatedly to present expert testimony. So the court would have be armed with the appropriate information to make an informed decision on what the vouchers are worth. And so we're asked. That's why we're asking the court to enter a fee recognizes as it stands, there's no evidence on the value of the vouchers. So to recognize the diminished value of the settlement and to adjust the The multiplier accordingly. And then alternatively, we're asking for a remand with instructions that the courts consider the redemption rates and make an adjustment based on the diminished value. Thank you, your honors. Thank you, Mr. Claw. Mr. Toll. Thank you. Good morning. May it please the court. Stephen told for the plaintiffs at police, your honors. Before I get into the legal questions, I want to give some background factual perspective that has to be taken into account. Plus, the purposes of CAFA speed provisions. I've been personally involved in this case since 2015. This was a very complicated case. You've read probably Judge Trang is long opinion on the motion to dismiss in late 2015 and his 40 page summary judgment ruling. There were 12 different claims brought. This was very hotly contested. We ended up after we had no luck in mediation with an outside mediator trying to get more than $5 million. He asked Judge Brinkman to get involved and she was terrific in getting this case settled. We were pushing for a lot of cash. She helped us get the maximum possible lumber liquidators was struggling financially. And we got $22 million in cash, but we did. We felt it wasn't enough. And we worked with the judge and defense council to get more value for the class members. And it came up with $14 million in coupons, which I'll get into a little later are very valuable to those who want them. And as you note in the record, there are 23,000 people who want the vouchers. And as your honor indicated, why select vouchers unless you want to probably use them? I can't guarantee 100% of the 23,000 will use them, but we think it's going to be a high likelihood. And there's a three year expiration period. We've only been through one year so far. And there are seven states, including two of the largest states where they sold this product that have no expiration date. So to follow out redemption forever, it could take many, many years. But what's the purpose of capitalist fee provisions? The purpose is to stop abuses by plaintiff's counsel in getting windfalls by getting valueless coupons in a settlement. That is not this case. And let me explain a little bit more about that. Number one, the cases both sides cited to your honors on the coupon issue under CAFA, just look at each one of them. Look at the inkjet case, which is the kind of outlier in the Ninth Circuit, only a two to one and a very strong dissent. The coupons there were two to $6. The Radio Shack case in the Seventh Circuit, you were dealing with $10 coupons, and they expired in six months. The Southwest Airlines case in the Seventh Circuit. Also, what the coupons were free alcoholic drinks, one drink. The Galloway opinion in the Eighth Circuit, a $10 off car rental. And then the liniment case in the Sixth Circuit, there was a $70 gift card and a replacement blender blade, an option. No cash involved in any one of them. This case is so different from all of those where courts dealt with the issue of abuses by plaintiff's counsel. And here, try to be modest about ourselves, but our other two co-lead counsel, you're talking about some of the leading firms doing class actions, and we're not in it to kind of get windfall fees. And Judge Trenga realized that because he was intimately involved in this case. He held status conferences every month. He and Magistrate Judge Jones oversaw the extensive discovery, 26 fact depositions, 10 experts, hundreds of thousands of pages of documents. So this was a hotly contested case. And the coupons here, again, comparing to these other cases, it ends up that on average worth $659 is the average coupon value. And the average price of a new floor was $1,100. So basically, for those who wanted coupons, they're getting 65% towards a new floor. Now, it is true that most people selected cash, but the coupons were also made available because remember, this case involved formaldehyde issues and durability issues, but especially formaldehyde issues raised a lot of health concerns. And some of the class members were very concerned about that and had this feeling, even though it may have dissipated over time, the formaldehyde impact, there were a lot of people complaining about coughing, sneezing, lung issues, headaches. And so those people are probably the ones who selected coupons because they want to replace their floors. So this was real value and basically not the kind of abuse case that CAFA was concerned about. Let me look at now. I don't think that's subject to reasonable dispute. I'd ask you why I should not be troubled. But what I think is what the district court obviously did here. Before he made his decision on September 4, 2020. But he was very familiar with this case and he recognized that the counsel in the case, the co-lead counsel, had put in over $12 million worth of time. And the statute says on a case like this, when you don't value coupons, if there's a partial coupon, you use the lodestar method. And he knew we had over $12 million worth of work. He also knew there was another $4 million by other counsel who assisted us that we didn't even put in for it to support our petition, which would have lowered the multiplier to 0.6. So he awarded a multiplier of 0.8, which is a negative multiplier. Of course, this is, again, not a windfall. In a way, we're not even making back our time. But, you know, he, I guess, felt it just was a fair and reasonable fee. And, you know, he clearly was aware of, you know, it took up a large percentage of the cash fund. But I don't, you know, he was to me, he was very thoughtful about the statute and how it should be applied. And he did everything he was supposed to do. I can't look into his mind, but he obviously felt we deserved a fee of $10 million and that it was fair to reaward the same amount. And it was proper. Mr. Cole, this is Judge King. Yes, Your Honor. We mentioned that possibility in the earlier opinion, did we not? You did mention it, Judge. About to be the same way or the same amount. And we've said that the district court were to award the same amount of attorney's fees after applying the PATHIS coupon settlement provisions. That would not render the settlement approval order infirm in light of a deferential standard for reviewing such decisions. This is all this very deferential that we are to need to be for these district judges that are dealing with these kinds of things. It's all due to discretion, isn't it? Yes. You know, Judge King, you, of course, that was something I was going to mention. I don't want to harp on what went through your mind, Judge Gregory and Judge Quattlebaum at the time. But you clearly indicated that there was a possibility that Judge Trenga could award the same fee if he felt it was appropriate under CAFA. And Judge Trenga was, again, very thoughtful and careful. He even mentioned in his opinion and Judge Hayden's. I think you the obvious part of his opinion that I think is so powerful for us, of course, contrary to what Mr. Clore has argued is he clearly stated, despite Mr. Clore's argument that he gave no value to the coupons at all in his decision. But he also said, I am buried in mind. This is page 10 of his opinion. The potential for abuse posed by coupon settlements and critically evaluating the claims of success on behalf of a class receiving coupons. So, again, I think he was very careful, recognizing it might be appealed again and went through what you're supposed to do in terms of making an award under Lodestar and considering measures of success. How long was Judge Trenga involved in this case? From the outset, Your Honor, back from 2015, when the case was this was two MDLs, the two MDLs that were transferred to him. And he's been overseeing this case since then. So, I mean, you can't find a judge who's more involved in a case. And again, I think very careful in how he went through his analysis. You know, the statute clearly allows the Lodestar analysis. He looked carefully at the Johnson factors and analyzed each one and recognized that. And then getting back, let me get to the measure of success, because, again, Mr. Clore has misstated the record of what Trenga did. He did talk about the coupons or vouchers when he talked about measure of success. But he did not place a 14 million dollars on them when he did that. And what he did just say is, you know, I think you can't ignore them. I'm not putting a value on them. I understand they're important and substantial to the people who select them. And I just can't ignore it. This was a good recovery by plaintiff's counsel, both of substantial cash and coupons that, you know, are valuable to those who select them. But he never said in doing the measure of success analysis that he was placing a 14 million dollar value on that. So I think he did everything that, you know, a judge is supposed to do in terms of looking at it under the statute. In terms of Mr. or the objector Johnson's argument, and again, I don't fully understand this argument that the settlement agreement, you know, says it's one third of 22 million dollars. I mean, the settlement agreement could not be clearer. Judge Hayden's pointed out. It says it's the total value is 36 million. It says we're going to seek fees of up to a third of that. It's at all. This is another argument that was made that that the objector Johnson said is that the settlement agreement nowhere says that the attorney's fees award is going to be paid out of cash. That is flatly wrong. It says it very specifically in the settlement agreement that any awarded attorney's fees shall be paid from the escrow account. And the escrow account is defined as in section 12 B of the settlement agreement is where the cash 22 million dollars is deposited. It is clear as a bell. And actually, what is even it's fortified is what the class members were told. If you look at the email notice at the postcard notice and the long form notice at J.A. all around 407 point 68 through 407 point 95, every single one of those documents says the cash portion will be used to pay the attorney's fees. Plaintiff's counsel can petition for up to 12 million dollars. It just and the total settlement value is 36 million. It just could not be clearer as to what the facts are here with regard to what the class was told and what the settlement agreement said. So I think, again, in summary, your honor, I really kind of gotten most of the points covered here. Now, one thing, again, to consider and judge Hayden's again, you were told, can I ask you this? Can I ask you about something you said earlier? Yes. I want you to pretend for the sake of argument that there were no vouchers at all, that it was just 22 million dollars in cash. We had to pretend the vouchers literally did not exist. Do you think this fee award would be reasonable then? You know, Judge, I don't know if we would have asked for that amount. I just can't say we probably would not have. I cannot think of cases where I've gone into a court on just the cash settlement and asked for 45 percent. So to answer, honestly, your question, I probably would not do that. And again, as class counsel here, your honor, there is no doubt in my mind of the value of these vouchers and their importance. And again, I don't you know, this it's outside the record. I hesitate slightly, but Mr. That actually brings me up. You know, you've said this several times and I appreciate that you're being candid. And I get the sense you're a very experienced person in this area. But I guess I'd ask you to respond to your friend on the other side. That's argument that it's all well and good for you to come before us and talk about the real world. And there's going to be these are really valuable and there's going to be a high redemption rate. And this isn't like these other cases, because you could have put in testimony to say all of the things that you're just representing to us based on your experience and argument. Why didn't you do that? Well, your honor, you can't really be sure in these cases. In fact, you'll remember looking through the record that we made an estimate at the outset of how many people would claim and we were way off. You know, we did an extensive notice program to try to get as many class members as possible to participate. And it was effective. This is almost like a record in a consumer case. We had twenty three and a half percent of claimants of the class members file claims. But most consumer cases are anywhere from two to five or maybe up to 10 percent. So we were way off in estimates and trying to get an expert to then come in and say something about claims. You know, it just to us is not the way to go. But again, Mr. Bacharach with, you know, again, a statement about a high redemption rate is 10 percent. And again, I mentioned it outside the record. Your honors can ignore it. We're already at twenty five percent in one year of redemptions of these vouchers. And we have a three year expiration. But there are still seven states that have no expiration. And two of them are the biggest in the country that had this product. So, again, I don't know what the end result is going to be. I am if it goes at this rate, we may end up with three quarters or 90 percent redemption. I don't know. And I suppose if you don't affirm, I guess Mr. Clore asks you to just reduce the fee would be totally wrong if you have any concerns about redemption. I mean, again, you could remand it and let it play out for another year or two until people can redeem. And actually that we would still have quite a lot of people who could still redeem after three years. But that's one reason we didn't go this redemption route that, you know, some of these other coupon settlements have like six months redemption. And that's it. You know, these are long redemption periods. And we already remember we're going through covid and we've got twenty five percent of people already claiming these vouchers. So, again, for those people and we didn't know it would end up this way, your honor. You know, we didn't know that class members would only end up with about sixty dollars or sixty six dollars. I think, you know, we had estimated to be much higher because we didn't anticipate such a high claims rate. But the vouchers ended up being close to six hundred and fifty nine dollars in value. So, you know, it's and again, people remember there was an option. So people did not have to select. Why would you ever select a voucher unless you're likely want to use them? Doesn't mean everyone's going to use them. We get it. But it's just a high likelihood most of the class members who chose vouchers will use them. So that's just a general view. And I hope that answered your question. But I think I've covered what I want, unless your honors have more questions. All right. Thank you, Mr. Toll. Mr. Marek, you have some time reserved. Thank you, your honor. Jumping right in, Mr. Toll's off the record numbers turn out to be three percent of the class because only 13 percent of the class chose coupons over cash. Eighty seven percent of the class members chose the cash option, even though it's a great deal less in terms of the value. According to class council, about 10 percent of the coupon value. Yeah. Everybody wants the cash. Really nobody wants the coupons. And the coupon redemption rate is three percent, which off the top of my head, based on 14 million dollars is. Four point two million dollars in value, not 14 million. Mr. Toll said that the district judge did everything the judge should do, but that's not exactly correct, because what this court said last time around was it recognized that the district court had a fiduciary duty to the class, fiduciary duty to the class, not a fiduciary duty to class council. So with regard to the attorney's fees being over 45 percent of the cash value of the class, that's not working within the fiduciary range of opportunities for the district court. It's a much larger fee than the court said last time around in terms of percentages than would be acceptable in this circuit. The court found that one third was higher than this circuit recognized. And that's why it came up with the 10 million dollar figure, which was 28 percent last time around. It's true that it's troubling, as Judge Hayden said, that the court granted the exact same number second time around, because in doing that, the court didn't take into any consideration its knowledge that the fee agreement, the settlement agreement, and the notice all say that attorney's fees are going to be limited to one third. And of course, as the record shows, when he asked Mr. Toll about that, Mr. Toll said there was no limitation on the attorney's fees. Not that it didn't apply anymore, but it just wasn't there. So we believe that under Virginia law, which governs this contract, the court should take out that section of the valueless coupons, apply the one third that class counsel agreed should be the amount of their attorney's fees, apply that number to the 22 million dollars and direct the district court or just enter the order yourself that the fee in this matter is approximately seven million dollars and not 10 plus. Thank you very much, Your Honors. Thank you, Mr. Toll. Yes. Thank you, Your Honors. The court did not find that this settlement was good or exceptional. It found that it was satisfactory. And in light of the fact that we're dealing with approximately 800 million in revenue from the floors that are issued that are a dispute in this case, and it considered a 36 million dollar settlement, which it found satisfactory and awarded a point eight multiplier. What we have now, class counsel have gone outside the record and suggested a 25 percent redemption rate, which 25 percent of 14 million is three and a half million. If we indulge those numbers, you still only get to 25 million. The court wasn't going off of a 25 million dollar settlement. It was going off a 36 million dollar settlement. So you still need an adjustment. The reason class counsel didn't present this this type of evidence, apart from the fact that, look, they didn't have the numbers at the time that the coupons hadn't been issued. But there's plenty of data out there that would have allowed them to extrapolate and come up with with evidence as to what the redemption rates might be. And so the reason they didn't want to do that is they didn't want to present those numbers to the district court when it already thought that the 36 million dollar settlement was just satisfactory. I want to address their distinctions of the Sixth and Seventh Circuit court opinions, which were all coupons. First of all, the issue is still the same. You shouldn't be allowed to inflate settlement value with the face value, the face value of coupons. And the primary benefit here is represented by class counsel as a 14 million dollar face value of the vouchers. So that the rationale for requiring courts to look at redemption rates is still applicable. And then they didn't address the EZ Sabre opinion from the Ninth Circuit, which was both a cash and coupon settlement. And there the court remarked that because it was also a lodestar and a percentage based fee award, the Court of Appeals vacated the fees and said, quote, because the district court incorporated the full face value of the coupons into both its percentage of recovery calculation and lodestar calculation of the fee award. This error requires recalculation of the fee award. So it's it's a distinction without a difference in this case that the Sixth and Seventh Circuit issued their opinions on full and complete voucher relief. Mr. Clark, are you urging this court to find that whenever there is a coupon element in a settlement, it's per se not to be considered for fee calculation? No, Your Honor, we're not asking for that at all. We're asking that if the court is going to consider the coupons, it has to grapple with the redemption rates and it has to look behind the face value of the coupons. All right. So what you're saying, your position is that the district court erred in not looking behind, looking at the redemption rates. And that's the error you're saying, because you agree is abuse of discretion is the standard of view, right? So actually, I don't agree that it's abuse of discretion. This is a interpretation of statute. Does does a statute allow you to award fees under the lodestar method without looking at the redemption value of the coupons? And our position is that under 1712A, there's a mandatory obligation to consider redemption rates. Well, it is abuse of discretion. What you're arguing is that an error of law is by definition an abuse of discretion. But it's abuse of discretion review, clearly. But an error of law can be an abuse of discretion. Well, your honor, I'm obviously not going to dispute. And we've got we've got cases that say that the abuse of discretion doctrine in the case is sharply circumscribed. Correct. We use that language. I mean, Judge Tringa gets deference here. I'm sorry, Judge. Are you finished? Yes. I was going to say I would agree with that position ordinarily. However, Kappa, you know, application of the statute is not subject to discretion. The court had no discretion to choose to misapply Kappa, which requires if you're going to attribute value to coupons, that you look behind their face value and consider redemption rates. So I understand the general deference that's accorded to district courts. But that deference doesn't apply when you're interpreting the statute. All right. Well, OK. Nothing further. No. Thank you. Thank you. Thank you so much, counsel. We appreciate your arguments. We wish we could come down and meet you in our normal fashion in the Fourth Circuit. We can't. But please know, nonetheless, we very much thank you for your arguments and your being here. Wish you well. Stay safe and be well. Thank you, your honor. Thank you. All right.
judges: Roger L. Gregory, Robert B. King, Toby J. Heytens